UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTA PARDO,

                Plaintiff,           Civil Action No. 15-10597
                                          Honorable Nancy G. Edmunds
                                          Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 13]**

Plaintiff Marta Pardo ("Pardo") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [10, 13], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

I.       **RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Pardo is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Pardo's Motion for Summary Judgment [10] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On April 24, 2012, Pardo filed an application for DIB, alleging a disability onset date of June 7, 2011.  (Tr. 128-30).  This application was denied initially on August 23, 2012.  (Tr. 85-88).  Pardo filed a timely request for an administrative hearing, which was held on September 12, 2013, before ALJ Kim Bright.  (Tr. 38-68).  Pardo, who was represented by attorney Marianne Dergham, testified at the hearing, as did vocational expert Charles McBee.  (*Id.*).  On September 26, 2013, the ALJ issued a written decision finding that Pardo is not disabled under the Act.  (Tr. 19-33).  On December 30, 2014, the Appeals Council denied review.  (Tr. 1-5).  Pardo timely filed for judicial review of the final decision on February 17, 2015.  (Doc. #1).

### B.    Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in

2

the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    *Pardo's Reports and Testimony*

At the time of the administrative hearing, Pardo was 42 years old, and at 5'8" tall, weighed 200 pounds.  (Tr. 43, 184).  She lived in a house with her husband and two minor children.  (Tr. 44, 156).  She completed two years of college but had no additional education. (Tr. 45-46).  Previously, she performed clerical work and then was employed as a district sales manager for Avon Corporation.  (Tr. 46-47).

Pardo alleges disability as a result of bipolar disorder, major depressive disorder, anxiety, rheumatoid arthritis, chronic foot pain, and migraines.  (Tr. 184).  She testified that she stopped working in June 2011, after she broke her foot dismounting a horse.  (Tr. 47, 50-51).  Since that time, she has had two surgeries on her foot, but says "it still hasn't stopped hurting."  (Tr. 50). At the time of the hearing, Pardo was wearing a "bone stimulator." (Tr. 49).

3

Pardo also testified that, at the time she stopped working, she was overwhelmed and "stressed out" at work as a result of her mental impairments. (Tr. 55). She sees both a psychiatrist and a therapist for her mental health issues. (Tr. 51). She testified that she had a "complete nervous breakdown" in 2000 and was hospitalized for two weeks, but she was able to continue working for years after this hospitalization. (Tr. 52-55). According to Pardo, she has always struggled with concentration and focus at work, but this problem gradually worsened over the years. (Tr. 53). In July 2012, she was hospitalized for three days after she reported attempting suicide by taking pills. (Tr. 54). She testified that she is "unmotivated" and "overwhelmed" and feels like there is a "great cloud over [her] head all the time." (Tr. 54). She also has difficulty with her memory, saying that she forgets "basically everything." (Tr. 56).

Pardo is able to drive and does so regularly. (Tr. 45, 160). She prepares meals, attends to her own personal care, cares for her son and horse, performs household chores (such as vacuuming, mopping, and sweeping), shops in stores, and is able to pay bills, use a checkbook, and handle a savings account. (Tr. 48, 157-60). She enjoys reading, watching television, scrapbooking, and spending time with her horse. (Tr. 48, 162). She talks to her mother frequently, attends church weekly, and goes out with her husband on occasion. (Tr. 56, 162).

*2.*   *Medical Evidence*

a.   <u>Physical Impairments</u>

On June 30, 2011, Pardo first saw Richard Needleman, M.D., who noted that she had a Lisfranc fracture of her right foot and recommended surgery (which was performed the following week). (Tr. 221-22). On July 20, 2011, Pardo returned to see Dr. Needleman, who noted that she had mild swelling but was progressing well. (Tr. 223). On August 3, 2011, and October 5, 2011, Dr. Needleman continued to note that Pardo was progressing well after surgery,

4

with no particular complaints. (Tr. 224-25). Pardo continued to have minimal discomfort, if any, over the next couple of months, and Dr. Needleman consistently noted that she was doing very well, with full range of motion, and no swelling, tenderness, or pain on provocative testing. (Tr. 225-27).

On January 18, 2012, Pardo underwent a second surgery to have the hardware from the first surgery removed. (Tr. 243-44). One week later, Dr. Needleman noted some discomfort on provocative testing, but unremarkable foot and ankle motion. (Tr. 228). On February 8, 2012, Pardo reported more pain than she had prior to the surgery, and she was directed to wear a footplate in her sneaker. (Tr. 229). On March 7, 2012, Pardo reported severe pain in the anterior aspect of her foot, saying that she could not tolerate the footplate. (Tr. 230). Dr. Needleman documented discomfort over the first tarsometatarsal joint and unremarkable foot and ankle motion. (*Id.*).

At a follow-up visit to Dr. Needleman on March 14, 2012, Pardo reported that she no longer had pain in the medial aspect of her foot, but she did have pain under the ball of her foot. (Tr. 231). According to Dr. Needleman, a CT scan showed a possible slight irregularity in the third tarsometatarsal joint and some narrowing along the plantar lateral aspect of the first tarsometatarsal joint. (Tr. 231, 441). He recommended a Spenco insert for her shoe. (Tr. 231).

On April 4, 2012, Pardo continued to report pain in the medial aspect of her foot and occasional lateral discomfort. (Tr. 232). Dr. Needleman suggested that they could take care of all present and possible future problems in one surgery by fusing the first tarsometatarsal joint, but Pardo was not interested in surgery at that time and wanted to wait until the fall. (*Id.*). As a result, Dr. Needleman stated: "It is important to know that not only may she require surgery in the future but she also is under significant limitations in her activity." (*Id.*).

Pardo returned to see Dr. Needleman on August 1, 2012, reporting less discomfort in the ball of her foot.  (Tr. 411).  She had no pain on examination but some discomfort in the inner aspect of her foot with ambulation.  (*Id.*).  On September 12, 2012, Pardo reported some discomfort when she performed particular maneuvers on her horse that required a lot of pressure on her foot.  (Tr. 358).  She indicated a desire to proceed with the third surgery that had been recommended, but Dr. Needleman postponed this surgery until after Pardo quit smoking.  (*Id.*).

Pardo eventually had a third surgery on October 25, 2012.  (Tr. 393-400).  One week later, she presented to Dr. Needleman with no complaints, saying that her foot felt fine.  (Tr. 359).  Dr. Needleman reported moderate swelling but noted that Pardo was progressing very well, and he again urged her to quit smoking, noting that it can increase healing time.  (*Id.*).  At follow-up visits in November and December 2012, Pardo reported that her foot felt fine, and Dr. Needleman consistently noted that she was progressing well.  (Tr. 360, 417).

On January 11, 2013, Pardo continued to report that her foot felt fine and that she was up to full weight bearing.  (Tr. 418).  Dr. Needleman again urged Pardo to stop smoking, as he was concerned that a nonunion was developing.  (*Id.*).  A CT scan performed a few days later showed stable postsurgical changes involving the midfoot.  (Tr. 444).  At a visit on January 25, 2013, Dr. Needleman added an arch support to Pardo's walker boot and recommended a bone stimulator.  (Tr. 419).  He also indicated that he had "been trying to get her back in the cast with the toe plate," but she refused.  (*Id.*).  On February 22, 2013, Pardo reported pain in the mid medial aspect of her foot.  (Tr. 420).  On examination, there was no swelling, but she had discomfort in the first tarsometatarsal region on provocative testing.  (*Id.*).

On March 29, 2013, Pardo reported no pain.  (Tr. 424).  A CT scan performed on April 5, 2013 was unchanged from the one three months earlier.  (Tr. 425, 445).  On April 12, 2013,

Pardo reported "absolutely no pain," and a few weeks later, she continued to report no pain. (Tr. 425-26). On May 24, 2013, Dr. Needleman noted that recent x-rays were unchanged and advised her to continue with the bone stimulator and full length graphite foot plate. (Tr. 427). He indicated that if she had continued pain, she might need revision surgery after she stopped smoking. (*Id.*). At her next visit, on June 21, 2013, Pardo reported that she had only a little discomfort over the medial aspect of her ankle. (Tr. 428). Dr. Needleman continued to have concern about whether her first tarsal metatarsal arthrodesis was healed and advised her to discontinue walking around the house barefoot. (*Id.*). On July 19, 2013, Pardo still had some discomfort, but a July 24, 2013 CT scan showed a stable right foot. (Tr. 429, 446).

> b.   Mental Impairments

Pardo treated with Michael Boudrie, a social worker, from 2010 to 2012. (Tr. 300-17, 320-57). She also received mental health counseling at Apex Behavioral Health from at least January 2011 through July 2013. (Tr. 270-91, 361-64, 447-66). Although these handwritten notes are difficult to decipher, they make clear that she routinely denied suicidal or homicidal ideations. (*Id.*). On July 5, 2012, however, she was briefly admitted to Oakwood Hospital after she claimed that she tried to harm herself by taking pills. (Tr. 389-91). From August 2012 to November 2012, Pardo continued to report moderate depression and anxiety, but a good response to treatment. (Tr. 322-23, 356-57). Updated progress notes from Apex indicate that Pardo's mental health remained stable or improving throughout 2013, with relatively normal exam findings. (Tr. 447-54).

On August 16, 2012, Pardo attended a psychological consultative examination with Gayle Oliver-Brannon, Ph.D. (Tr. 296-99). Pardo reported being able to care for her hygiene, perform household chores, prepare meals, and shop. (Tr. 296-97). She demonstrated appropriate

judgment and insight, and her speech was clear and logical. (Tr. 297). Pardo was diagnosed

with bipolar disorder and general anxiety disorder, and her prognosis was characterized as fair to

guarded. (Tr. 298). Dr. Oliver-Brannon then opined:

> The claimant seems to need ongoing medical and mental health services to
> treat mood and psychiatric issues. Such issues seem to prevent her from
> engaging in successful long term employment. She is able to engage in
> simple to moderate daily living tasks. She seems socially appropriate with
> others. She seems motivated to improve [her] condition and recognizes
> she needs mental health treatment to function as normal as possible. She
> does adhere to basic standards of neatness and cleanliness.

(Tr. 299).

### 3.    *Vocational Expert's Testimony*

Charles McBee testified as an independent vocational expert ("VE") at the administrative

hearing. (Tr. 59-67). The ALJ asked the VE to imagine a hypothetical individual of Pardo's

age, education, and work experience who can perform light work with the following additional

limitations: occasional climbing of ramps or stairs; occasional climbing of ladders, ropes, or

scaffolds; occasional stooping, balancing, kneeling, crouching, and crawling; able to perform

simple, routine tasks consistent with unskilled work in a static work environment with few

changes; and only superficial interactions with coworkers, supervisors, and the public. (Tr. 62-

65). The VE testified that the hypothetical individual would not be capable of performing

Pardo's past relevant work. (Tr. 64-65). However, the VE further testified that the hypothetical

individual would be capable of working in the jobs of photocopy machine operator (2,000 jobs in

the state of Michigan), hand packager (3,000 jobs), and folder (2,000 jobs). (Tr. 64-65).

### D.    The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Pardo has not

engaged in substantial gainful activity since June 7, 2011 (the alleged onset date). (Tr. 21). At

Step Two, the ALJ found that Pardo has the severe impairments of bipolar disorder, major

depressive disorder, rheumatoid arthritis, migraines, fractured foot status-post surgery, and obesity. (Tr. 22). At Step Three, the ALJ found that Pardo's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 22-24).

The ALJ then found that Pardo retains the residual functional capacity ("RFC") to perform light work with the following limitations: occasional climbing of ramps or stairs; occasional climbing of ladders, ropes, or scaffolds; occasional stooping, balancing, kneeling, crouching, and crawling; able to perform simple, routine tasks consistent with unskilled work in a static work environment with few changes; and only superficial interactions with coworkers, supervisors, and the public. (Tr. 24).

At Step Four, the ALJ determined that Pardo is unable to perform her past relevant work as a sales manager, claims technician, or clerical worker. (Tr. 31-32). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Pardo is capable of performing a significant number of jobs that exist in the national economy. (Tr. 32-33). As a result, the ALJ concluded that Pardo is not disabled under the Act. (Tr. 33).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the

merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence

10

supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

**F.    Analysis**

In her motion for summary judgment, Pardo argues that the ALJ erred in (1) failing to adequately assess the credibility of her subjective complaints; and (2) failing to give adequate weight to the opinion of her treating physician, Dr. Needleman.  (Doc. #10 at 15-21).  Each of these arguments is addressed below.

*1.    Substantial Evidence Supports the ALJ's Credibility Analysis*

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record.  *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible.  *Soc. Sec. Rul.* 96-7, 1996 WL 374186, *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529.

11

In this case, after finding at Step Two that Pardo suffers from severe mental and physical impairments (Tr. 22), the ALJ concluded that she nevertheless retains the residual functional capacity to perform a reduced range of light work (Tr. 24-31).  In reaching this conclusion, the ALJ specifically referenced Pardo's testimony that she cannot work because of her depression and inability to focus, as well as ongoing pain from her June 2011 right foot injury and subsequent surgeries.  (Tr. 25).  However, the ALJ found that while Pardo's conditions could reasonably be expected to produce the alleged symptoms, her statements about the intensity, persistence and limiting effects of those symptoms were not entirely credible to the extent they conflicted with the RFC assessment.  (Tr. 25-31).

Pardo challenges this conclusion, principally arguing that the ALJ "failed to give specific reasons for discrediting her testimony" beyond "general statements."  (Doc. #10 at 16).  The Court disagrees.  As explained in greater detail below, in evaluating Pardo's credibility, the ALJ specifically considered her activities of daily living, the objective medical evidence, and Pardo's lack of adherence to prescribed treatment, and she gave good reasons for discrediting Pardo's allegations of work-preclusive limitations.  (*Id.*).

As an initial matter, with respect to Pardo's physical impairments, the ALJ properly considered the objective medical evidence when evaluating her credibility.  Specifically, the ALJ noted that this evidence showed that Pardo responded well to treatment for her physical impairments.  (Tr. 26-27).  After Pardo had surgery in June 2011, subsequent progress notes reflect that the surgery was successful in relieving her symptoms, and she was progressing well.  (Tr. 26, 223-27).  Moreover, as the ALJ noted, physical examinations showed that Pardo had unremarkable foot and ankle motion and minimal discomfort (if any) on provocative testing.  (Tr. 26, 223-32).  In addition, a CT scan performed in March 2012, showed the fixation plate and

12

screws intact with no evidence of bony destruction or lytic changes to suggest osteomyelitis. (Tr. 26, 441).

The ALJ also noted that Pardo eventually reported some discomfort when she performed certain maneuvers on her horse[1] and, as a result, underwent fusion surgery of the first tarsometatarsal joint with a calcaneal bone graft to her right foot in October 2012. (Tr. 26, 358, 393-400). By January 2013, however, Pardo reported that she was having very little pain or discomfort, and examinations revealed no swelling. (Tr. 26, 418). Since that time, progress notes reveal that Pardo has continued to have minimal, if any, pain. (Tr. 26, 424-28). Moreover, an April 2013 CT scan showed a stable right foot. (Tr. 446). Such objective evidence is a "useful indicator" for an ALJ to use when evaluating the credibility of a claimant's symptoms. *See* 20 C.F.R. §404.1529(c)(2) ("Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.").[2]

The ALJ also noted that Pardo's allegations of disabling mental symptoms are inconsistent with the treatment notes, which reflect that she has responded well to treatment. (Tr. 28). Indeed, recent treatment notes reveal that Pardo has routinely had normal speech and

---

[1] The mere fact that Pardo was able to participate in horseback riding is inconsistent with complaints of disabling pain.

[2] The ALJ also considered the fact that Pardo "has not been entirely compliant in following prescribed treatment recommendations" in concluding that her symptoms "may not have been as limiting as [she] has alleged in connection with this application." (Tr. 30). Specifically, the ALJ noted that Pardo has continued to smoke cigarettes, despite repeatedly being advised to quit, as it places her at a higher risk for developing nonunion and increased incidence of wound problems and infection. (Tr. 30-31, 359-60, 417-19, 425). This is a proper consideration. *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (concluding that the ALJ properly discounted the claimant's credibility where he failed to follow prescribed treatment); *Soc. Sec. Rul. 96-7p*, 1996 WL 374186, at *8 (noting that "the individual's statements may be less credible if … the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").

thought process, with her judgment, insight, orientation, memory, and concentration also fair and/or improved after her medications were adjusted. (Tr. 28, 447-54). The ALJ also noted that, at the August 2012 psychological consultative examination, Pardo presented as cooperative and in contact with reality, with appropriate judgment and insight, as well as clear and logical speech. (Tr. 28, 297). Again, the inconsistency between Pardo's allegations of disability and the objective medical evidence is a valid consideration in evaluating her credibility.[3] *See, e.g., Allen v. Comm'r of Soc. Sec.*, 2015 WL 574910, at *3-4 (E.D. Mich. Feb. 11, 2015) (affirming ALJ's decision to discount claimant's credibility where the treatment notes were inconsistent with the severity of her alleged mental limitations).

In addition, in assessing the credibility of Pardo's allegations, the ALJ noted that, despite her allegations of disabling symptoms, she engages in extensive daily activities. Specifically, the ALJ noted that Pardo is able to care for her hygiene, perform household chores, prepare meals, shop, drive, and manage money. (Tr. 30). The ALJ also noted that Pardo routinely talks to her mother on the telephone, reads, watches television, and attends church, all of which suggest a broad range of ability to focus, concentrate, and interact socially. (*Id.*). It was entirely appropriate for the ALJ to consider the fact that Pardo's ability to perform daily activities is less limited than one would expect, given her allegations of disabling symptoms. *See Walters*, 127 F.3d at 532 (an ALJ may consider household and social activities in evaluating the credibility of the claimant's allegations of disabling symptoms).

In sum, the ALJ recognized the duty imposed upon her by the regulations and, contrary to Pardo's assertions, did far more than make "general statements" that Pardo was not credible.

---

[3] In evaluating the credibility of Pardo's claims of disabling mental symptoms, the ALJ also appropriately considered the fact that she actually stopped working due to her foot injury, and not because of any mental impairment. (Tr. 31). Indeed, as the ALJ noted, Pardo was able to work for more than ten years after a 2000 mental health hospitalization. (Tr. 31, 52-53).

(Doc. #10 at 16).   Indeed, in assessing Pardo's credibility, the ALJ properly considered her

activities of daily living, the objective medical evidence, and her lack of adherence to prescribed

treatment.  Thus, the ALJ's credibility determination is supported by substantial evidence.[4]

>        2.      *Substantial Evidence Supports the ALJ's*
>                *Decision to Give Little Weight to Dr. Needleman's Opinion*

Pardo also argues that the ALJ erred in giving "little weight" to the April 2012 opinion[5]

of her treating physician, Dr. Needleman.  (Doc. #10 at 18-21).   Courts have recognized that an

ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is

'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is

'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakley*, 581 F.3d at

406 (internal quotations omitted).   While treating source opinions are entitled to controlling

weight under these circumstances, it is "error to give an opinion controlling weight simply

---

[4] Towards the end of her argument regarding the ALJ's credibility assessment, Pardo asserts: "here, Plaintiff's ability to work has been severely over-estimated, resulting in an erroneous finding that she retains the ability to perform light work. The ALJ ignored Plaintiff's numerous additional significant symptoms when determining that he could work as a photocopy machine operator, hand packager or folder (for example from the VE's findings). The ALJ seems to have ignored even his own hypothetical posed to the VE, which asked if Plaintiff would be able to work if it was necessary for him to use the bathroom 8-10 times per shift, for approximately 5 minutes per bathroom break. (Tr. 73).… Therefore, [sic] is requested that this matter be remanded due to the ALJ's failure to consider the effects claimant's severe depression and pain on her ability to perform sustained work activities."  (Doc. #10 at 17-18).  This argument is flawed in numerous respects. First, Pardo cannot show error by making a conclusory statement that the ALJ purportedly "ignored [her] numerous additional significant symptoms," without specifying what those symptoms are. Second, Pardo's reference to the need for bathroom breaks appears to be related to a different male claimant, not Pardo; Transcript page 73 is not part of the hearing testimony in this case, and nowhere during the actual hearing in this case was such an issue discussed.  Finally, as discussed above, the ALJ did adequately discuss Pardo's credibility in the context of her alleged mental impairments.

[5] In her motion for summary judgment, the Commissioner argues that, "Dr. Needleman never offered any 'medical opinion' subject to the Treating Physician's Rule."  (Doc. #13 at 23). Though the Court finds some merit to this argument – as the "opinion" at issue is merely a single sentence contained in a treatment note – it is a moot issue, because Pardo's substantive argument lacks merit.

because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence."). If the ALJ declines to give a treating physician's opinion controlling weight, she must document how much weight she gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. §404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion)).

In his April 2012 opinion, Dr. Needleman stated that, "It is important to know that not only may [Pardo] require surgery in the future but she also is under significant limitations in her activity." (Tr. 232). The ALJ explicitly considered Dr. Needleman's statement, noting that it was "not consistent with the totality of the record." (Tr. 28). For example, the ALJ noted that Dr. Needleman's own progress notes failed to reveal the significant clinical and laboratory abnormalities one would expect if Pardo were indeed so limited, "as examinations by him showed sensation without any deficit, unremarkable foot and/or ankle motion and *minimal discomfort*, if any, on provocative testing." (Tr. 28 (citing Tr. 223-32, 243, 405-09, 411-12, 430-33, 437-38) (emphasis in original)). And, the ALJ noted that Dr. Needleman's statement was inconsistent with the "relatively benign" CT findings, as well as Pardo's activities of daily living (including the fact that she was able to ride her horse until at least September 2012). (Tr. 28).

16

Pardo makes no effort to address – let alone rebut – the reasons offered by the ALJ for discounting Dr. Needleman's opinion.

In sum, the Court concludes that the ALJ gave good reasons for giving little weight to Dr. Needleman's opinion, and these reasons are supported by substantial evidence. *See* 20 C.F.R. §404.1527(c).[6]

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [13] BE GRANTED, Pardo's Motion for Summary Judgment [10] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: October 30, 2015                    s/David R. Grand
Ann Arbor, Michigan                        DAVID R. GRAND
                                           United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will

---

[6] In the last paragraph of her motion, Pardo appears to challenge the ALJ's Step Five determination based on the suggestion that a "static work environment" would preclude jobs such as a hand packager. (Doc. #10 at 23). Pardo offers no support for this assertion, however, and she ignores the fact that the VE provided testimony to the contrary. (Tr. 65). Thus, this argument too is without merit.

be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 30, 2015.

s/Felicia Moses for Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
